United States District Court
Southern District of Texas
**ENTERED**
November 15, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| VS. § | CRIMINAL ACTION NO. 4:21-CR-272 |
| § | |
| LEIDY ARELI HERNANDEZ LOPEZ § | |
| and § | |
| OCTAVIAN OCASIO § | |
| and § | |
| EMMANUEL PADILLA REYES; aka § | |
| BONILLA, § | |
| § | |
| Defendants. § | |

## ORDER

Pending before the Court is the United States Government's ("the Government") motion for revocation of an order issued by Magistrate Judge Reyes of the Eastern District of New York releasing Defendant Octavian Ocasio ("Ocasio") on bond.[1] The Government's motion (Dkt. 24) is **GRANTED**.

### I.   BACKGROUND FACTS

A federal grand jury in the Southern District of Texas indicted Ocasio for fourteen counts of wire fraud and one count of conspiracy to commit wire fraud for his involvement in "a scheme to use fictitious car dealerships to issue and sell hundreds of thousands of Texas temporary buyer tags . . . without selling cars." (Dkt. 1). The indictment indicated that such "illegal tags pose a danger to the public and to law enforcement because purchasers use them to avoid obtaining registration, safety

---

[1] Ocasio consented to an order of detention pending disposition of the Government's motion. *See* Eastern District of New York case number 1:21-MJ-901 at minute entry dated August 6, 2021.

inspections, and liability insurance, and can use them to hide their identity from law enforcement." (Dkt. 1 at p. 2). Each count on which Ocasio was indicted carries a potential penalty of up to 20 years in prison. *See* 18 U.S.C. §§ 1343, 1349.

After the grand jury returned the indictment, a warrant was issued for Ocasio's arrest. (Dkt. 6). Ocasio's listed address was on Rockaway Turnpike in the New York City metropolitan area ("the Rockaway Turnpike address"), and a special agent from the New York field office of the Federal Bureau of Investigation ("FBI") contacted Ocasio at a phone number that Ocasio was using to sell temporary buyer tags. (Dkt. 31 at p. 2; Dkt. 31-4 at p. 7). The agent informed Ocasio of the arrest warrant and told Ocasio that he needed to turn himself in, which Ocasio agreed to do the following day. (Dkt. 31 at p. 2; Dkt. 31-4 at p. 7). The next day, Ocasio neither turned himself in nor contacted the FBI. (Dkt. 31 at p. 2; Dkt. 31-4 at p. 7).

About a week and a half later, the FBI contacted Ocasio again at the same number and asked if he was going to turn himself in. (Dkt. 31 at p. 2; Dkt. 31-4 at p. 7). Ocasio said that there had been a death in his family and that he was getting his affairs in order. (Dkt. 31 at p. 2; Dkt. 31-4 at p. 7). But two months went by after that conversation, and during that time Ocasio still neither turned himself in nor contacted the FBI. (Dkt. 31 at pp. 2–3; Dkt. 31-4 at pp. 7–8). FBI agents ultimately located Ocasio using GPS data from his cell phone and arrested him in New York. (Dkt. 31 at p. 3; Dkt. 31-4 at pp. 7–8).

Ocasio's refusal to turn himself in was evidently very much in character for him. Ocasio's prior arrest record includes numerous bench warrants in both New York and Georgia, as well as convictions in those two states for crimes including forgery, falsifying

business records, and giving false information to law enforcement. (Dkt. 31-3 at pp. 4–7). When he was arrested on his federal warrant, Ocasio's New York driver's license was suspended because he had previously failed to answer a summons from a New York court. (Dkt. 31-3 at p. 7).

Moreover, the Government claims that Ocasio continued to engage in the sale of illegal vehicle tags after the FBI notified him of his federal indictment. (Dkt. 31 at pp. 2–3; Dkt. 31-4 at pp. 7–8). According to the Government, during the two-month period between the issuance of the arrest warrant and Ocasio's arrest, FBI agents texted Ocasio's cell phone pretending to be prospective buyers of illegal vehicle tags. (Dkt. 31 at pp. 2–3; Dkt. 31-4 at pp. 7–8). Ocasio responded to the text with the price of the tags and instructions regarding how to submit the information he needed and how to pay him. (Dkt. 31 at pp. 2–3; Dkt. 31-4 at pp. 7–8). The record does not reflect that Ocasio denies these allegations.

At Ocasio's arraignment, Magistrate Judge Reyes described the question of whether to release Ocasio on bond as "a close call." (Dkt. 31-4 at p. 13). After expressing concerns about Ocasio's alleged post-indictment attempts to sell illegal vehicle tags and about Ocasio's "history . . . of bench warrants[,]" Magistrate Judge Reyes decided to release Ocasio "on $100,000 bond with pre-trial services supervisions subject to random home and workplace visits, and a curfew with location monitoring as directed by pre-trial services." (Dkt. 31-4 at p. 13). Magistrate Judge Reyes also restricted Ocasio's travel "to New York City, Long Island, and the Southern District of Texas for the purpose of going to court[.]" (Dkt. 31-4 at p. 13).

A pivotal argument made by Ocasio in obtaining release on bond was that Ocasio's home had long been and would indefinitely continue to be the Rockaway Turnpike address. Ocasio told Pretrial Services just after his arrest that he had lived at the Rockaway Turnpike address since 1995. (Dkt. 31-1 at p. 2). Ocasio's counsel told Magistrate Judge Reyes that the Rockaway Turnpike address was "the family house . . . where [Ocasio had] lived for 30 years" and contended that "the Government ha[d] not made any real case for a risk or a likelihood of flight given the fact that Mr. Ocasio ha[d] remained in his residence." (Dkt. 31-4 at p. 10). Since Ocasio had lived at the Rockaway Turnpike address for so long, Ocasio's counsel argued, the Government "could have arrested [Ocasio] at his home. They knew where that was, so there's no risk of flight here." (Dkt. 31-4 at p. 10).

However, evidence entered into the record after Magistrate Judge Reyes's order indicates that Ocasio, at best, exaggerated the stability of his connection to the Rockaway Turnpike address. A supplemental report compiled by Pretrial Services after Ocasio's bond hearing states that Ocasio's brother, who owns the Rockaway Turnpike home, "revealed that [Ocasio] does not live at the [Rockaway Turnpike] address" and that he "does not know where [Ocasio] resides." (Dkt. 31-3 at p. 2). Ocasio's brother also told Pretrial Services that the other family members who lived at the Rockaway Turnpike address "did not want [Ocasio] to live [there.]" (Dkt. 31-3 at p. 2). And no reliable alternative residence for Ocasio exists in the record: although one of Ocasio's cousins has offered to let Ocasio live at a house in New York, that cousin spends six months out of

every year in Florida and does not want to be a third-party custodian for Ocasio. (Dkt. 31-3 at p. 3).

Pretrial Services, which initially recommended release on bond with conditions, has changed that recommendation "[b]ased on the inconsistency of information pertaining to [Ocasio's] residence and residence history, and questionable stability of proposed residence[.]" (Dkt. 31-1 at p. 8; Dkt. 31-3 at p. 8). The supervision problem posed by Ocasio's indeterminate residence is compounded by the fact that Ocasio has no apparent fixed workplace or steady employer to which he must regularly report—he told Pretrial Services after his arrest that he had been "self-employed for more than ten years[.]" (Dkt. 31-3 at p. 2). Pretrial Services now "recommends that [Ocasio] be removed in custody to face charges in [the] Southern District of Texas." (Dkt. 31-3 at p. 8).

## II.  THE APPLICABLE LEGAL STANDARDS

18 U.S.C. § 3145 allows the Government to file a motion with the district court to revoke a magistrate judge's pretrial release order. 18 U.S.C. § 3145(a)(1). When ruling on such a motion to revoke, the district court is required to make an independent, de novo determination of the proper pretrial detention or conditions for release. *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992). The district court may also reopen a detention hearing if it "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

Under the Bail Reform Act, a defendant shall be released pending trial unless a judicial officer determines that no condition or combination of conditions on the defendant's release will reasonably assure the appearance of the defendant as required and the safety of any other person and the community. *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989); *see also* 18 U.S.C. § 3142(e)(1). "The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning[:] (1) the nature and circumstances of the offense charged[;] (2) the weight of the evidence against the person; (3) the history and characteristics of the person[;][2] and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The determination of whether conditions of release can be imposed that will reasonably assure the appearance of the person as required is made using the preponderance-of-the-evidence standard, while the determination of whether conditions of release can be imposed that will reasonably assure the safety of any other person and the community is made using the clear-and-convincing-evidence standard. *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). If the Government is seeking pretrial detention, it bears the burden of persuasion on both determinations but need only prevail

---

[2] The "history and characteristics of the person" include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" as well as "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law[.]" 18 U.S.C. § 3142(g)(3).

on one of them, as "a detention order may rest on a determination that no condition or combination of conditions will reasonably assure either the defendant's appearance *or* the safety of the community[.]" *Hare*, 873 F.2d at 798–99 (emphasis in original).

### III. THE GOVERNMENT HAS MET ITS BURDEN.

The Court, guided by the statutory factors listed in 18 U.S.C. § 3142(g), has examined the record of the proceedings before Magistrate Judge Reyes; the parties' briefing; and the additional information that Pretrial Services obtained after Magistrate Judge Reyes issued his bond order. The Court finds that, with the additional information, the Government has met its burden to establish that no conditions of release will reasonably assure Ocasio's appearance as required.

—*The nature and circumstances of the offense charged*

The first statutory factor, the nature and circumstances of the offense charged, weighs against Ocasio. Ocasio's indictment states that he stands accused of selling illegal vehicle tags that can be used "to hide [one's] identity from law enforcement." (Dkt. 1 at p. 2). Ocasio, in other words, is charged with providing materials to his customers that enable them to hide their identities from law enforcement officers. Ocasio's possession of and familiarity with such materials weighs in favor of finding Ocasio to be a flight risk. Moreover, each of the fifteen counts on which Ocasio was indicted carries a potential penalty of up to 20 years in prison, strengthening his motive to flee and hide from law enforcement.

—*The weight of the evidence*

The second statutory factor, the weight of the evidence against Ocasio, also favors continued pretrial detention. The indictment contains a thorough discussion of multiple illegal transactions in which Ocasio allegedly engaged. Although there was little discussion at the bond hearing of the evidence supporting the indictment, unrebutted allegations in the record indicate that Ocasio attempted to sell illegal vehicle tags to FBI agents posing as prospective customers even after he was indicted for that very crime.

—*Ocasio's history and characteristics*

The third statutory factor, Ocasio's "history and characteristics" as defined in 18 U.S.C. § 3142(g)(3), favors continued pretrial detention.

There is no indication that Ocasio can be trusted to appear in court as ordered on his own power; his record concerning appearance at court proceedings is abysmal. As Magistrate Judge Reyes noted, Ocasio's criminal history is rife with bench warrants that were issued when he failed to appear in court as required. When he was arrested on his federal warrant, in fact, Ocasio's New York driver's license was suspended because he had previously failed to answer a summons from a New York court. Since the purpose of a flight-risk determination is to secure the appearance of the accused at trial, Ocasio's repeated flouting of other courts' summonses cuts deeply against release on bond.

Consideration of the other subfactors listed in 18 U.S.C. § 3142(g)(3) further convinces the Court that pretrial detention is necessary to secure Ocasio's appearance at trial. Ocasio's criminal history includes convictions in New York and Georgia for crimes including forgery, falsifying business records, and giving false information to law

enforcement. Ocasio repeatedly failed to turn himself in after telling FBI agents—who ultimately had to track him down using GPS data and arrest him—that he would do so. He made misleading (and perhaps outright false) statements to Pretrial Services regarding his place of residence. He has no verifiable home address, fixed workplace, or steady employment. His siblings evidently are refusing to let him live in the family home. Although one of Ocasio's cousins has offered to let Ocasio live at a house in New York, that cousin spends six months out of every year in Florida and does not want to be a third-party custodian for Ocasio. Under these circumstances, the Court would have to rely entirely on electronic monitoring to secure Ocasio's appearance at trial, and the Court is unwilling to do so in this case. *See United States v. McElroy*, No. 95-CR-447, 1996 WL 53811, at *3 (E.D. Pa. Feb. 7, 1996) ("I conclude that no conditions are sufficient to secure the defendant's appearance at trial because electronic monitoring is not foolproof . . . and the defendant has extensive experience with assuming different identities when it suits his purpose.").

> —*The nature and seriousness of the danger to any person or the community that would be posed by Ocasio's release*

On this record, the fourth statutory factor—the nature and seriousness of the danger to any person or the community that would be posed by Ocasio's release—favors release on bond. It does not appear that Ocasio has ever been charged with a violent crime; his criminal history lists a domestic incident report and a temporary protection order but provides no details for either line item.

The Government argues that "[t]he use of temp tags is a serious public safety issue in the New York area" and has included in its briefing the link to a video in which, as the Government puts it, New York City Mayor Bill de Blasio and his Chief of Police "outline[] how these tags are being used in other crimes, including dozens of shootings." (Dkt. 31 at pp. 2–3). If true, these statements are certainly worrisome; but in the absence of sworn testimony or reliable documentary evidence, the Court will not rely on the Facebook video to conclude that Ocasio's release poses a danger to the community.

## IV.   CONCLUSION

Having conducted the required de novo review of Magistrate Judge Reyes's findings and considered the supplemental information obtained by Pretrial Services after Magistrate Judge Reyes made his bond decision, the Court concludes that detention pending trial is appropriate. The Government has met its burden to establish that no conditions of release will reasonably assure Defendant Octavian Ocasio's appearance as required. The Government's motion under 18 U.S.C. § 3145(a) (Dkt. 24) is **GRANTED**.

Defendant Octavian Ocasio is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with all court proceedings.

SIGNED at Houston, Texas, this 15th day of November, 2021.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE